# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

SMASH FRANCHISE PARTNERS, LLC,    )
and SMASH MY TRASH, LLC,    )
    )
    Plaintiffs,    )
    )
    v.    )    C.A. No. 2020-0302-JTL
    )
KANDA HOLDINGS, INC., TODD PERRI,    )
KEVIN MCLAREN, and DUMPSTER    )
DEVIL, LLC,    )
    )
    Defendants.    )

## MEMORANDUM OPINION

Date Submitted: July 22, 2020
Date Decided: August 13, 2020

Lauren Neal Bennett, Sarah P. Kaboly, D. McKinley Measley, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Tracy N. Betz, Neil Peluchette, TAFT, STETTINIUS & HOLLISTER LLP, Indianapolis, Indiana; *Attorneys for Plaintiffs.*

Michael F. Bonkowski, Andrew L. Cole, COLE SCHOTZ P.C., Wilmington, Delaware; Steven K. Fedder, FEDDER & JANOFSKY LLC, Baltimore, Maryland; *Attorneys for the Defendants.*

**LASTER, V.C.**

Plaintiffs Smash Franchise Partners, LLC, and Smash My Trash, LLC (jointly, "Smash") operate a mobile trash compaction business and sell franchises to entrepreneurs who want to run a Smash-branded franchise in a protected territory. The core business involves using a truck-mounted mobile trash compactor to smash trash in a customer's dumpster. Smashing the trash enables the customer to pack more trash into each dumpster load and save on fees paid to the waste management company that provides the dumpster and hauls away the waste.

Defendant Todd Perri expressed interest in a Smash franchise. He soon concluded that with his engineering background and business experience, he could create his own mobile trash compaction business. Despite deciding to form his own business, Perri continued to feign interest in a Smash franchise and gather information about Smash.

Perri and his college fraternity brother, Kevin McLaren, formed Dumpster Devil LLC as a competing mobile trash compaction business. On their website, they compared Dumpster Devil's equipment and economic returns to Smash's equipment and economic returns. They also purchased the name "Smash My Trash" from Google AdWords, so that when users in certain geographic areas searched for Smash My Trash, the top result was a paid advertisement for Dumpster Devil.

Smash filed this lawsuit and sought a preliminary injunction that would shut down Dumpster Devil's business. Smash's scattershot application invokes eight different legal theories: breach of a non-disclosure agreement (the "NDA"), unjust enrichment, misappropriation of trade secrets, conversion, unfair competition, fraud, deceptive trade practices, and trademark infringement.

The theories that could support broad injunctive relief depend on showing that the defendants obtained and used confidential information from Smash. To obtain a business-stopping injunction as a form of interim relief, the information would need to be highly confidential and valuable.

At this stage of the case, the record does not support a business-stopping injunction. All of the information that the defendants received was publicly available, freely shared by Smash's franchisees, or provided by Smash without taking adequate precautions to protect its confidentiality. The information was primarily designed to convince interested entrepreneurs to purchase a franchise, and it reflected the type of information that one would see in a detailed sales pitch. It was specific enough to attract prospective franchisees, but not specific enough to reveal critical information about Smash.

The fact that Smash is not entitled to a business-stopping injunction does not legitimize Perri and McLaren's conduct. Their actions were disingenuous and underhanded. They did not, however, acquire legally protected information that could support the type of broad preliminary injunction that Smash seeks.

Smash has established a reasonable likelihood of success on the merits of its claim for deceptive trade practices. It is reasonable likely that some of the comparisons between Dumpster Devil's equipment and Smash's equipment are false and misleading. This decision grants a limited preliminary injunction that prohibits the defendants, pending a final decision on the merits after trial, from making statements about (i) Smash's hydraulic drum lacking protective guards, (ii) the slides on Smash truck's needing daily greasing,

and (iii) the Dumpster Devil truck weighing less than 26,000 pounds and not requiring a commercial license. Otherwise, Smash's application for a preliminary injunction is denied.

## I. FACTUAL BACKGROUND

The facts are drawn from the record developed in connection with the Smash's application for a preliminary injunction. What follows are the facts as they appear likely to be found after trial, based on the current record.

### A. Smash's Business

Starting in 2015, non-party Justin Haskin developed a plan to "disrupt the commercial waste industry" by providing trash compaction services at the customer's place of business rather than at a centralized location. Haskin Dep. at 35. By providing mobile trash compaction services, Haskins sought to "help clients realize financial savings as to their trash hauling fees and reduce emissions." Haskin Decl. ¶ 5.

Haskin founded Smash and serves as its president and CEO. The Company started as a local service, then shifted into a franchise model. Smash sold its first franchise in April 2019, and its first franchisee began operating in October 2019.

In YouTube videos, Smash shows how its truck-mounted compactor smashes trash. The unit is mounted on the bed of a truck and consists of a cab and a weighted, serrated drum that is attached to a roller arm. A driver controls the roller arm from the cab and uses it to lower the drum into a dumpster. The driver then moves the drum across and through the trash to compact it. The videos describe how much money a customer can save by contracting with Smash.

3

**B.      Perri Asks About A Smash Franchise.**

Perri is a serial entrepreneur who holds a Bachelor of Science in Mechanical Engineering from Carnegie Mellon University, a Master of Science in Mechanical and Aerospace Engineering from Princeton University, and a Master of Business Administration from Stanford University. He is the sole shareholder of defendant Kanda Holdings, Inc., a North Carolina company.

Perri learned about Smash when he replied to a blind advertisement on the website bizbuysell.com. The advertisement read, "Commercial Waste Management–patent pending technology." Perri Dep. I 63-64.

Trish Scelfo, the owner of an independent franchise broker called The Franchise Collective, posted the advertisement for Smash. She responded to Perri's inquiry and set up an initial call. During a call on December 4, 2019, Scelfo pitched Perri on buying a Smash franchise. She gave him a broad overview of Smash's business and equipment, including information about where Smash obtained its equipment, where the franchises were located, and where Smash had available territories. She discussed how Smash intended to pursue relationships with businesses that have nationwide operations (so-called national accounts) so that franchisees could benefit from those relationships. She also discussed the level of competition in the industry, the extent of competition for national accounts, and the types of businesses that are Smash's principal customers. She explained to Perri what the start-up and operating costs would be and what software he would use to run a Smash franchise.

Scelfo directed Perri to Smash's website and its YouTube channel where he could learn more and see videos of Smash's equipment in action. Scelfo also sent Perri an introductory presentation, referred to as a pitch deck, that discussed Smash and its business model. The pitch deck described Smash's business strategy of being first to market in the mobile trash compaction business. It also described what Smash views as its principal competitive advantage: structuring its operations as a trucking business rather than a waste management business. As Smash portrays it, a waste management business responds to a customer's request to dispose of trash on an *ad hoc* basis and charges per call. A trucking company establishes routes that its trucks follow regularly and charges its customers a flat fee. Smash likes to describe its operating model as akin to a FedEx or UPS route but without the boxes. *See* Haskin Dep. at 26–28; Dkt. 91 Ex. 7.

The pitch deck identified the steps involved in obtaining a franchise. First, a prospective franchisee would participate in an introductory call. Second, a prospective franchisee would participate in a "unit economics call" about the economics of a franchise, including the start-up and operating expenses (the "Unit Economics Call"). After the call, the prospective franchisee would receive an Excel workbook containing the economic data (the "Unit Economics Worksheet").

After these two introductory calls, a prospective franchisee could commit to attending "discovery day," an event where potential franchisees would travel to Smash's home office and learn about Smash's "secret sauce." As proof of the potential franchisee's commitment to attending discovery day, the potential franchisee would need to provide

5

proof of purchase of a plane ticket. Before being permitted to attend discovery day, a prospective franchisee would have to sign an NDA.

During the process, the prospective franchisee would be able to participate in two types of videoconferences. One type, called a "Franchisee Forum Call" or "Validation Call" occurred weekly on Thursdays and was hosted by current franchisees, who described how they ran their franchises and answered questions about their business. No one from Smash participated in the Franchisee Forum Calls. The other type of call, called a "Founder Call," occurred weekly on Wednesdays and was hosted by Haskins, who talked about the Company's history and prospects and answered questions.

At the end of this process, after attending discovery day, a prospective franchisee could apply to purchase a franchisee. If Smash approved the application, then the prospective franchisee and Smash would sign a franchise agreement.

## C.      Perri Speaks With Franchise Fastlane.

Perri told Scelfo that he was interested in a franchise. Scelfo referred Perri to Brittany Bode, the Director of Franchise Development for Franchise Fastlane, Inc. ("Fastlane"). Fastlane is an independent contractor for Smash that acts as its exclusive sales representative for franchises. Fastlane handles the process through the franchisee's execution of a franchise agreement. As part of that process, Fastlane sets up and runs the Franchisee Forum Calls and Founder Calls.

On December 5, 2019, Bode spoke with Perri by phone for his introductory call. Bode described the history of Smash, the number of current franchises, their current locations, the identity of one of Smash's national accounts, the software required to run the

business, and how Smash divides responsibilities between the franchisor and franchisees. According to Perri's notes, Bode told him that Smash would not provide certain information about its pricing and business model until Perri signed an NDA.

On December 9, 2019, Perri attended the Unit Economics Call, which was a conference call hosted by Bode for multiple prospective franchisees. Bode discussed the start-up costs and operating expenses of a Smash franchise in detail.

After the Unit Economics Call, Bode provided the participants with the Unit Economics Worksheet, a copy of Smash's franchise disclosure document (the "Disclosure Document"), and an NDA. Under federal law and under regulations promulgated by the Federal Trade Commission, a franchisor must maintain a current franchise disclosure document that is publicly available. The franchise disclosure document must contain the information necessary for a franchisee to make an informed decision about whether to enter into a franchise relationship. *See* 16 CFR § 436. Fourteen states require that a franchisor file an additional disclosure document that complies with specific state regulations. *See, e.g.*, Cal. Corp. Code § 31500.

Smash's Disclosure Documents disclosed a wide range of information, including

- the initial investment required for a franchise, broken down by line item;

- extensive disclosures about a franchise's expected financial performance;

- the identity of the manufacturer of Smash's equipment;

- the estimated the size of a Smash franchise territory by population;

- the number of trucks a franchisee would need to purchase to service the number of territories owned;

7

- the number of trucks a franchisee would need to purchase based on the volume of business conducted;

- the number of extant Smash franchises.

The Disclosure Documents made clear that franchisees were "independent contractors" and that neither the franchisee nor the franchisor was "the agent, partner, joint venturer, or employee of the other." *See, e.g.*, Dkt. 92 Ex. 13 at 29.

Smash does not consider the information in the Disclosure Document to be confidential. Smash also does not regard the information in the pitch deck, the introductory call, the Unit Economics Call, or the Unit Economics Worksheet to be confidential. Haskin Dep. at 104.

**D.    Perri Signs The NDA.**

Perri told Bode that he was interested in pursuing a franchise. To take the next step in the process, he had to sign a document averring that he had received the Disclosure Document. He also had to return and sign an NDA.

Perri signed and returned both documents.  He told Bode that he wanted to attend the next discovery day, scheduled for January 6 and 7, 2020.

**E.    Perri And McLaren Consider Setting Up A Competing Business.**

After signing the NDA and telling Bode that he was interested in a franchise, Perri texted and then called McLaren. Perri and McLaren were college fraternity brothers. Like Perri, McLaren holds a Bachelor of Science in Mechanical Engineering. He is the owner and operator of a roll-off dumpster business and a commercial landscaping business. Given their training as engineers and experience in business, Perri and McLaren began discussing

8

whether they could develop their own mobile trash compaction company without needing a Smash franchise.

Two days later, on December 11, 2019, Perri joined a Founder Call on Zoom, a web-based video-conferencing application. Bode had sent Perri the meeting ID, which he could use to access any of the weekly Founder Calls and Franchisee Forum Calls. Zoom has features that a host can use to control who participates in a meeting, such as requiring a password for access and placing participants into a waiting room so that the host can admit them individually after verifying their identity. Smash's Zoom meeting did not use any of these features. It was open to anyone who had the meeting ID. All of Smash's subsequent calls used the same meeting ID, and none required a password or used a waiting room.

After logging into the Zoom meeting, Perri discovered that the call had been canceled. Two other prospective franchisees had joined the meeting. The three talked for about half an hour, then left.

**F.    Perri Decides To Set Up A Competing Business.**

On December 12, 2019, Perri joined his first Franchisee Forum Call. The invitation stated:

> The Franchisee Forum Calls are scheduled once per week with Smash My Trash franchisees randomly selecting the time slot they are available to participate. The Franchisees that participate in the Franchisee Forum Calls represent a cross section of the franchise base and each have different lengths of time in the franchise system. You are invited to attend as many Franchisee Forum calls as you like. …
>
> Please understand that the franchisee's answers are their answers. Whatever they say is based on their experience.

9

Dkt. 94 Ex. 32. The invitation thus made clear that the franchisees who provided information during the call did not represent Smash and did not speak on its behalf.

Several franchisees spoke during the call on December 12, 2020. They covered

- how many smashes a truck could complete in an hour,

- how many smashes they completed in a week,

- pricing for scheduled smashes versus on-demand smashes,

- customer identities and per-month revenue from individual customers,

- how they used Google Earth to identify customers,

- which types of businesses make good customers,

- how they pitched potential customers, and

- potential conflicts with waste management companies and strategies for resolving conflicts.

Dkt. 84 Ex. 8 at '879-80.

After leaving the Franchisee Forum Call, Perri texted McLaren. He wrote that as long as he could "mount this gadget on the truck myself," then there was nothing preventing him from "do[ing] the same thing." Dkt. 84 Exs. 16, 17.

With this insight, Perri and McLaren embarked on a campaign of deception. When dealing with Smash, Perri feigned interest in purchasing a Smash franchise. On this pretense, he continued to collect information about Smash. Meanwhile, Perri and McLaren worked on setting up their own mobile trash compaction business to compete with Smash.

10

## G.    The Two Tracks Of December 2019

For the rest of December 2019, Perri and McLaren worked on two tracks. On the first track, Perri participated in Smash-sponsored calls to gather information. On the second track, Perri and McLaren made preparations for their competing business.

As part of the first track, on December 13, 2019, Perri bought a plane ticket to attend discovery day. He sent proof of his purchase to Fastlane and registered to attend the discovery day on January 6 and 7, 2020. On December 14, the very next day, Perri canceled his flight. He did not tell Fastlane that he had cancelled his flight, and he did not cancel his registration for discovery day.

As part of the second track, on December 15, 2019, Perri registered the domain name "Dumpster Devil."  He also contacted a potential supplier about purchasing equipment.

As part of the first track, on December 18, 2019, Perri participated in his first Founder Call. During the call, Hawkins discussed a variety of topics, including

- the history of the company,

- the current state of the Company,

- the forty-one franchise territories that Smash had sold across the United States,

- the value that Smash brings to its customers by typically saving them between 25% and 30% in waste disposal fees,

- his preference for per-month pricing rather than per-smash pricing,

- his belief that Smash franchisees could work collaboratively with local waste management companies,

- current growth opportunities and the need to promote customer awareness, and

11

- the potential benefits of working with national accounts and developing a franchisee referral network so that franchisees could refer business to each other.

Dkt. 84 Ex. 8 at '877-78.

Also as part of the first track, on December 19, 2019, Perri participated in a second Franchisee Forum Call. The franchisee hosting the call reported that he was following Haskin's advice and signing local contracts with national accounts, including a national amusement park chain. He also spoke about his interest in a referral network and the possibility of working with waste management firms to offer national accounts a volume-based pricing model. Under this model, the national account would pay for trash hauling by weight, which would align the interests of the waste management firm with those of the Smash franchise.

As part of the second track, on the same day as the Franchisee Forum Call, McLaren contacted Husmann Umwelt Technik, GmbH, the manufacturer of the truck that Smash used. McLaren asked for a price quotation to supply trucks to Dumpster Devil. Husmann declined because it had an exclusive arrangement with Smash.

Undaunted, on December 20, 2019, Perri emailed Packmat Maschinebau, GmbH, a competing manufacturer. On December 24, Perri spoke with Packmat about becoming Dumpster Devil's exclusive supplier of trucks.

## H.    The Two Tracks During January 2020

With the start of the new year, Perri needed to address the looming problem of the discovery day scheduled for January 6 and 7, 2020. He could not risk attending because he would learn confidential information about Smash's "secret sauce" that would make it

12

dangerous to launch a competing business. He had no intention of attending, having cancelled his plane ticket three weeks earlier. But if he admitted that he was no longer interested in a franchise, then he would not have an excuse for continuing to participate in Founder Calls and Franchisee Forum Calls.

Perri solved his problem by telling Fastlane that his dog was sick. On January 3, 2020, he formally canceled his attendance at the discovery day scheduled for January 6 and 7, 2020. He then immediately signed up for the next available discovery day which would occur on January 26 and 27.

Having solved the discovery day problem, Perri and McLaren continued working on their two separate tracks. Along the first track, Perri participated in a third Franchisee Forum Call on January 9, 2020. According to Perri's notes, the franchisee discussed

- the operating costs of the business, including payroll, rent, and gas;

- using Google Earth to identify dumpsters;

- how to pitch potential customers using projected savings;

- considerations when hiring a driver;

- the compensation structure that the franchisee used for drivers; and

- typical customer concerns, such as whether the extra weight would result in higher hauling and landfill costs.

Dkt. 84 Ex. 8 at '885-86.

Continuing along the first track, Perri participated in a fourth Franchisee Forum Call on January 17, 2020. During this call, the franchisee discussed similar topics, including

- the operating costs of the business, including maintenance for the truck, its operating life of seven years, and overhead costs;

13

- using Zillow, Zoho, and LinkedIn to identify customers;

- how to pitch potential customers using projected savings; and

- considerations when hiring a driver.

*Id.* One franchisee identified his projected earnings, explaining that he anticipated profits of $600,000 during his first year and between $1 and $1.1 million in his second year. *Id.* at '885–86.

Still continuing along the first track, Perri participated in a fifth Franchisee Forum Call on January 20, 2020. The franchisee largely repeated information that had been provided on other calls. The franchisee discussed pricing models in general terms but did not share his specific models because not everyone on the call was a franchisee. The franchisee disclosed that his typical account involved between ten and fifteen smashes per week and a "whale" called for 100 or more smashes per week. *Id.* at '885.

Meanwhile, along the second track, Perri and McLaren worked with Packmat on specifications and pricing for equipment. On January 15, 2020, Packmat referred Perri to a chassis dealer for trucks. On January 21, Packmat emailed Perri a description of equipment that it could provide and offered to set up a demonstration.

Back on the first track, Perri joined his second Founder's Call on January 22, 2020. Haskin discussed the following topics:

- Smash's number of franchises;

- Smash's goal of becoming the name-brand mobile trash compaction company by being first to market;

- some general ideas for improving the mobile trash compactor;

14

- the goal of garnering national accounts;

- progress on replacing Smash's current software with enterprise-level software;

- the benefits of Smash's route-based, trucking-company model;

- why Smash's franchise territories are "protected" rather than "exclusive," and

- pricing for construction sites and how to pitch Smash's services.

Dkt. 84 Ex. 8. As with the first Founder's Call, the substance of Haskin's presentation was designed to convince prospective franchisees to buy a Smash franchise.

On January 24, 2020, Perri canceled his attendance at the discovery day scheduled for January 26 and 27. He falsely claimed that he was interested in exploring different territories than he had originally identified.

As January 2020 came to a close, Perri participated in two more Smash-sponsored calls. On January 27, 2020, he attended his third Founder Call. During the call, Haskin addressed

- aspects of fleet management, including how maintenance costs, preventative maintenance, and the parts that often need to be replaced;

- using a hub-and-spoke model for maintenance, with one centralized independent contractor overseeing all of the trucks;

- operating a single shift, preferably at night, to maximize efficiency;

- using Huffspot to convert leads into customers;

- his views on competitors.

*Id.* On January 30, 2020, Perri joined another Franchisee Forum Call. Perri did not take notes on this call, and Smash does not record its calls. As a result, there is no persuasive evidence regarding the contents of that call.

15

## I.      Perri And McLaren Reach A Deal With Packmat.

During the end of January 2020, Perri and McLaren prepared to travel to Canada to meet with Packmat. Perri created a presentation about Dumpster Devil that described a business model closely resembling Smash's model. Perri contemplated selling territories defined by population. He anticipated establishing regional offices to handle truck parking, drivers, and sales. He described using a hub-and-spoke model for maintenance and hiring an independent contractor to oversee repairs. Like Smash, Dumpster Devil would work with waste management companies as "hauling partners" to form a vertically integrated supply chain. Like Smash, Dumpster Devil would prioritize national accounts.

The principal difference was that Perri wanted to avoid the level of regulation associated with selling franchises. Perri's goal was to get as close to a franchise model as possible "without being a franchise." Perri Dep. II at 302–03. To walk the line, Dumpster Devil would act as an exclusive supplier of equipment and as the licensor of the Dumpster Devil brand. Licensees would receive assistance with routing, maintenance, and administration.

Perry's presentation also discussed the competition. When discussing Smash, the presentation identified the manufacturer of Smash's truck and described the types of customers Smash targets, the capital required to start a Smash franchise, and how many franchises Smash had sold. The presentation also discussed Smash's marketing strategy and its effort to capture a first-mover advantage. Perri hoped that by not offering franchises, Dumpster Devil could beat Smash to the markets where Smash had to file for franchise approval.

16

After creating the presentation for Packmat, Perri asked Fastlane to notify him about future discovery days. Fastlane provided dates, but Perri never signed up.

On February 4, 2020, Perri and McLaren gave their presentation to Packmat. They persuaded Packmat to become Dumpster Devil's exclusive supplier.

## J. Perri Attends Additional Calls.

After securing the deal with Packmat, Perri attended two more calls with Smash: a Founder Call on February 5, 2020, and a Franchisee Forum Call on February 6. According to Perri's notes, these calls provided the same information as the previous Founder and Franchisee Forum Calls. Those were the last two calls that Perri attended.

Perri participated in approximately ten hours of Smash-sponsored calls. He took detailed notes, and often wrote down the names of the participants.

In total, 114 people joined the calls in which Perri participated. Of those, ninety-four signed NDAs or were franchisees or Fastlane employees who had signed separate confidentiality agreements with Smash. The remaining twenty participants fell into two groups: (i) those that neither Smash nor Fastlane could identify, and (ii) those who did not sign an NDA. Smash did not follow procedures to limit access to the calls. Bode was supposed to take roll at the beginning of each call and remove anyone who did not belong, but she never did.

## K. Perri And McLaren Launch Dumpster Devil.

In early March 2020, Perri and McLaren launched Dumpster Devil's website and opened for business. Their website markets Dumpster Devil as a seller of mobile trash

compaction equipment and advertises its vehicle as "the most advanced open truck trash compactor on the market." Dkt. 84 Ex. 2.

The Dumpster Devil website devotes an entire page to comparing Dumpster Devil to Smash. According to the website,

- Dumpster Devil's drum weighs one-half of a ton more than Smash's drum, leading to faster trash compaction.

- Dumpster Devil's drum has guards, while Smash's does not.

- Smash's truck supplier, Husmann, has sold less than fifty truck-mounted compactors.

- Smash's truck bed requires daily greasing, which lowers efficiency.

- Dumpster Devil's equipment is 10% more efficient than Smash's equipment.

- Dumpster Devil's truck does not require a special license to operate.

*Id.*

Perri and McLaren also bought a Google AdWords advertisement for the name "Smash My Trash." When users in certain geographic areas search for "Smash My Trash" in Google, the top listing is a paid advertisement for Dumpster Devil. Until April 14, 2020, the title of the advertisement stated, "Better Than Smash My Trash–No Franchise Fees, Higher ROI." Dkt. 84 Ex. 43. By using Smash's trademark in the advertisement, Dumpster Devil violated Google policy, and Smash filed a complaint with Google. Dumpster Devil subsequently changed the advertisement to "Compare Our Dumpster Smasher–No Franchise Fees, Higher ROI." *Id.*

Dumpster Devil has received multiple inquiries. Many were from individuals who also were considering a Smash franchise. Dumpster Devil sold two trucks to two separate third parties.

**L.      Smash Files Suit.**

On April 20, 2020, Smash filed this action. The operative complaint asserts eight causes of action:

- Count I asserts a claim for breach of the NDA against Perri and Kanda Holdings;

- Count II asserts a claim for unjust enrichment against Perri, McLaren, Kanda Holdings, and Dumpster Devil;

- Count III asserts a claim for misappropriation of trade secrets against Perri, McLaren, Kanda Holdings, and Dumpster Devil;

- Count IV asserts a claim for conversion of intangible property against Perri, McLaren, Kanda Holdings, and Dumpster Devil;

- Count V asserts a claim for unfair competition against Dumpster Devil;

- Count VI asserts a claim for fraud against Perri and Kanda Holdings;

- Count VII asserts a claim for deceptive trade practices against Dumpster Devil based on statements about Smash on the Dumpster Devil website, and

- Count VIII asserts a claim for trademark infringement against Dumpster Devil based on Dumpster Devil's purchase of "Smash My Trash" from Google AdWords and its use of the mark in Dumpster Devil's marketing campaign.

Smash sought a preliminary injunction barring the defendants from "(1) using and/or disclosing the Confidential Information; (2) using and/or disclosing [Smash's] confidential and proprietary information; (3) using and/or advertising using [Smash's] intellectual property, including their trademarks; and (4) competing with [Smash]." Dkts. 20 at 24.

19

## II.    LEGAL ANALYSIS

Smash seeks a preliminary injunction that would prevent the defendants from competing with Smash. In substance, this form of relief would halt the defendants' entire business. Failing that, Smash seeks an injunction against the allegedly false comparisons between its products and Smash's products that appear on the Dumpster Devil website. Smash also asks this court to enjoin Dumpster Devil from using the "Smash My Trash" trademark as part of a Google AdWords marketing campaign.

To obtain a preliminary injunction, a plaintiff must demonstrate (i) a reasonable probability of success on the merits, (ii) a threat of irreparable harm if an injunction is not granted, and (iii) that the balance of the equities favors the issuance of an injunction. *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Co.*, 506 A.2d 173, 179 (Del. 1986). "The elements are not necessarily weighted equally. A strong showing on one element may overcome a weak showing on another element. However, a failure of proof on one of the elements will defeat the application." *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998).

The bulk of this decision addresses the first element of the test. Evaluating this element requires parsing through Smash's eight different legal theories.

## A.    Breach Of Contract

In its first claim, Smash contends that Perri and Kanda Holding breached their contractual obligations under the NDA. Smash has not established a reasonable probability of success on this claim because Smash has not made a sufficient showing that Perri received confidential information.

20

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003). When interpreting a contract, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted). "It is well established that a court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

In this action, the parties agree that the NDA was a valid contract and that its terms restricted Perri and Kanda's ability to use Smash's confidential information. Section 1 of the NDA defined "Confidential Information" to include

> all non-public, confidential or proprietary information disclosed before, on or after the Effective Date, by Company to Recipient or their affiliates . . ., including without limitation:
>
> (a)     all information concerning Company's and its affiliates' and their customers' suppliers' past, present and future business affairs including, without limitation, finances, financial statements, customer information, supplier information, products, services, organizational structure and internal practices, forecasts, sales and other financial results, records and budgets, and business, marketing development, sales and other commercial strategies;

(b)     Company's unpatented inventions, ideas methods and discoveries, trade secrets, know-how, unpublished patent applications and other confidential intellectual property;

(c)     all designs, specifications, documentation, components, source code, object code, images, icons, audiovisual components and objects, schematics, drawings, protocols, processes, and other visual depictions, in whole or in part, of any of the foregoing;

(d)     any third-party confidential information (including, without limitation, any Personal information as defined in Section5 below) included with, or incorporated in, any information provided by Company to Recipient or its Representatives;

(e)     any other information that would reasonable be considered non-public, confidential or proprietary given the nature of the information and the Parties' businesses; and

(f)     all notes, analyses, compilations, reports, forecasts, studies, samples, data, statistics, summaries, interpretations, and other materials (collectively, "Notes"), prepared by or for Recipient or its Representatives that contain, are based on, or otherwise reflect or are derived from, in whole or in part, any of the foregoing.

Dkt. 84 Ex. 5 § 1.

Continuing, Section 1 of the NDA provided that "Confidential Information" did *not*

include any information that

(a)     at the time of disclosure is, or thereafter becomes, generally available to and known by the public other than as a result of, directly or indirectly, any act or omission by Recipient or an of its Representatives;

(b)     at the time of disclosure is, or thereafter becomes, available to the Recipient on a non-confidential basis from a third-party source, provided that such third party is not and was not prohibited from disclosing such Confidential Information to Recipient by any legal, fiduciary or contractual obligation;

(c)     was known by or in the possession of Recipient, as established by documentary evidence, prior to being disclosed by or on behalf of Company pursuant to this Agreement; or

(d)     was or is independently developed by Recipient, as established by documentary evidence, without reference to or use of, in whole or in part, any of Company's Confidential Information.

*Id.* § 2.

Smash contends that Perri received Confidential Information by participating in the initial calls with Fastlane, the Franchisee Forum Calls, and the Founder Calls. The analysis differs for the three types of calls.

### 1.     The Franchisee Forum Calls

The Franchisee Forum Calls are easiest to address. During those calls, Perri did not receive Confidential Information within the meaning of the NDA. The definition of Confidential Information only encompassed information disclosed "by Company." *Id.* § 1. The NDA defined "Company" as "SMT Holdings, LLC and its affiliates (including but not limited to Smash Franchise Partners, LLC and Smash My Trash, LLC)." *Id.*

During the Franchisee Forum Calls, Smash and its affiliates did not disclose any information to the participants. During the Franchisee Forum Calls, selected Smash franchisee were given free rein to speak about their businesses.[1] The franchisees were not Smash's affiliates. Smash's Disclosure Documents stated that its franchisees were "independent contractors" and that neither the franchisee not the franchisor was "the agent, partner, joint venturer, or employee of the other." *See, e.g.*, Dkt. 92 Ex. 13 at 29.

---

[1] Fastlane hosted the Franchisee Forum Calls, but there is no evidence that Fastlane provided any information during the calls. The analysis therefore focuses on the franchisees. Regardless, Fastlane also was an independent contractor and not an affiliate of the Company.

Prospective franchisees had to read and sign a copy of the Disclosure Document containing this disclosure before participating in Franchisee Forum Calls. Consistent with this disclosure, the invitation to the Franchisee Forum Calls stated that "[t]he franchisee's answers are their answers. Whatever they say is based on their experience." Dkt. 94 Ex. 32. Haskins testified that Smash franchisees were not affiliates. Haskin Dep. at 15, 36.

Smash also argues that even if they were not actual agents, the Smash franchisees had apparent authority to speak on Smash's behalf. Apparent authority is a means of imputing liability to a party that clothes another with the apparent authority to act as its agent. It is not a means of imposing obligations on a third party, as Smash attempts to do in this case.[2] Nor did the franchisees have apparent authority to speak on behalf of Smash. The Disclosure Document and the invitation to the Franchisee Forum Calls made clear that the franchisees were independent contractors and not Smash's agents precisely so that Smash would not face any risk of liability for what the franchisees said.

Because the franchisees were not affiliates of Smash, none of the information shared on the Franchisee Forum Calls was Confidential Information. Smash does not have a reasonable likelihood of success on the merits based on the defendants' use of any information shared during the Franchisee Forum Calls.

---

[2] *See, e.g.*, *Billops v. Magness Constr. Co.*, 391 A.2d 196, 198 (Del. 1978); *Henderson v. Chantry*, 2002 WL 244692, at *4 (Del. Ch. Feb. 5, 2002); *Restatement (Second) of Agency* § 267 (1958).

## 2. The Fastlane Calls

The second group of calls is the initial set of calls between Perri and Fastlane. During a call on December 5, 2019, Bode told Perri about the history of Smash's business, the number of current franchises, the current franchise locations, the identity of one of Smash's national accounts, the software required to run the business, and how Smash divides responsibilities between the franchisor and franchisees. During the Unit Economics Call on December 9, Bode discussed the start-up costs and operating expenses of a Smash franchise. After the call, Bode provided the participants with the Unit Economics Worksheet, a copy of the Disclosure Document, and the NDA.

Assuming for the sake of argument that Fastlane is deemed to be Smash's agent for purposes of these calls, the information that Fastlane provided was not confidential within the meaning of the NDA. The calls were initial sales calls designed to give interested parties an overview of a franchise. The information was comparable to what Scelfo provided in her initial call with Perri and which appears in the pitch deck. The information also resembled what appears in the Disclosure Document. The record indicates that Smash does not regard the information as confidential. Haskin Dep. at 104. Smash notably did not contemplate any recipient executing an NDA until *after* receiving this information. Recipients who did not sign the NDA and who decided not to proceed any further in the process would receive this information without incurring any confidentiality obligation and could use the information freely.

It is clear that none of the information shared in the initial calls with Fastlane was intended to be confidential. Smash does not have a reasonable likelihood of success on the merits based on the defendants' use of any information shared during the initial calls.

### 3. The Founder Calls

During the Founder Calls, Haskins provided information on behalf of the Company. Because Haskins spoke on behalf of the Company, the information could fall within the definition of "Confidential Information." Under the NDA, however, Confidential Information does not include information that is "generally available to . . . the public" or which "is, or thereafter becomes, available to the Recipient on a non-confidential basis from a third-party source."

During the Founder Calls, Haskin generally discussed points that were publicly available and non-proprietary. Most of the information paralleled what franchisees were freely providing during the Franchisee Forum Calls or which Smash voluntarily provided in its initial presentation, during the introductory calls with Fastlane, on its website, and in its YouTube videos. Topics during the Founders Calls included:

- Current Smash territories,

- Smash's first-mover business strategy,

- Smash's strategy of operating as a trucking company rather than as a waste management company,

- A Smash franchise's expected expenses and profits,

- How to partner with waste management companies,

- How national accounts and referral relationships could benefit franchisees,

- Fleet management,

- The hub-and-spoke maintenance model,

- The identity of certain customers,

- Smash's general pricing model,

- Methods of identifying potential customers, and

- Growth opportunities.

Dkt. 84 Ex. 8.

Smash maintains that the information Haskin provided during Founder Calls is not publicly available, but the record does not support that assertion. Haskin's Founder Calls closely tracked the topics in Smash's pitch deck and its Disclosure Document, with perhaps slightly more detail. The topics covered in the pitch deck and Disclosure Document include the main items that Smash claims are confidential. Those items include Smash's first-to-market strategy, its model of operating as a trucking company rather than as a waste management company, and how to run a maintenance operation through an independent contractor using a hub-and-spoke model.

Smash claims that its introductory pitch deck and Disclosure Document did not cover how to turn regional accounts into national accounts and the idea of partnering with local waste management companies. Both are basic concepts, particularly for someone like Perri, who has a Master's Degree in Business Administration from Stanford University. Plus, information on these topics is widely available. *See, e.g.,* Wilson McCrory et. al., "How to Unlock Growth in the Largest Accounts," mckinsey.com/business-functions/marketing-and-sales/our-insights/how-to-unlock-growth-in-the-largest-

27

accounts# (accessed August 4, 2020). In any event, the franchisees freely discussed these topics during Franchisee Forum Calls, which, as discussed, are not confidential. *See* Dkt. 84 Ex. 8 at '876–77. The information thus did not qualify as Confidential Information in the first place.

### 4. The Conclusion Regarding Breach Of The NDA

Smash failed to establish a reasonable likelihood of success on the merits of its claim for breach of the NDA. At this stage of the case, it appears that the information Perri received from Smash was either (i) publicly available or (ii) not Confidential Information within the meaning of the NDA. To reiterate, Perri engaged in disingenuous and underhanded conduct by participating in the Founder Calls and Franchisee Forum Calls under false pretenses. Nevertheless, Smash has not established a reasonable likelihood that Perri acquired Confidential Information that was subject to protection.

## B. Unjust Enrichment

In its second claim, Smash assert a theory of unjust enrichment. According to Smash, the defendants were unjustly enriched by taking Smash's confidential information and using it to their benefit.

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988) (internal quotation marks omitted). "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and

28

impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

Smash has not shown a reasonable probability of success on a claim for unjust enrichment. Smash claims that it was impoverished and the defendants enriched because the defendants took its information. As discussed previously, the information that the defendants acquired was not confidential. It was information that Smash provided freely in its Disclosure Documents, its pitch deck, its introductory calls, and its Franchisee Forum Calls. Haskins provided similar information in his Founder Calls. Because the information was freely available, the defendants were not unjustly enriched, and Smash was not impoverished.

Taking the NDA into account leads to the same result. A claim for unjust enrichment "is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim." *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009) (citations omitted). Here, Smash's claim for unjust enrichment is predicated on the same facts as the claim for breach of the NDA and turns on whether the information that the defendants obtained was protected by the NDA. Because Smash failed to establish a reasonable likelihood of success on its claim for breach of the NDA, Smash likewise failed to establish a reasonable likelihood of success on the claim for unjust enrichment.

C.     **Misappropriation Of Trade Secrets**

In its third claim, Smash accuses the defendants of misappropriating trade secrets. To establish a reasonable likelihood of success on this claim, Smash must show both the

29

existence of a trade secret and its misappropriation. 6 *Del. C.* §§ 2001–02. A "trade secret" is defined as

> information, including a formula, pattern, compilation, program, device, method, technique or process, that:
>
> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

6 *Del. C.* § 2001(4). "Accordingly, to qualify as a 'trade secret,' information must both derive independent economic value from not being generally known or readily ascertainable and be subject to reasonable efforts to maintain its secrecy." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 589 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).

### 1. Smash Has Not Shown A Reasonable Likelihood Of Success On Its Claim To Have Protectable Trade Secrets.

Smash identifies its trade secrets, in relevant part, as

> how [Smash] operates as a trucking company, rather than a trash company (and what that means), [Smash]'s proactive model, routes, and pricing, a business model based on density and customer basis, design and performance of equipment, . . . specific customers, pricing models specific to certain geographics, future models and projections for the business, including highly confidential plans to . . . partner with hauling providers.

Dkt. 84 at 41. This information does not qualify as trade secrets, at least in the form in which Smash presented the information to Perri.

As discussed, much of this information was not secret at all. Smash made it publicly available in its Disclosure Documents and freely available in its pitch deck, introductory

30

call, Unit Economics Call, and Unit Economics Worksheet. *See* Dkt. 91 Ex. 7; Dkt. 92 Ex. 10; Dkt. 94 Ex. 28. Smash shared this information to differentiate itself as part of its effort to sell franchises. The information does not qualify as a trade secret.

Smash claims that it does not make public the names of the national accounts and tries to analogize those names to a customer list, which courts frequently protect.[3] The record indicates that during the introductory calls and Franchisee Forum Calls, Perri learned the names of some national accounts. But there is a fundamental difference between what Smash shared, namely the names of a few national organizations, and a true customer list, which contains more detailed information that results from the expenditure of significant time, effort, and expense and has independent economic value for the business.

Smash also claims that it does not make public the fact that it plans to partner with local waste management companies. Courts have held that the process by which a business forms a relationship with customers or other businesses may constitute a trade secret. *See, e.g.*, *Milso Indus. Corp. v. Nazzaro*, 2012 WL 3778978, at *8 (D. Conn. Aug. 30, 2012).

---

[3] *See Great Am. Opportunities, Inc. v. Cherrydale Fundraising*, LLC, 2010 WL 338219, at *8 (Del. Ch. Jan. 29, 2010) (holding that customer lists that former employees of a fundraising company obtained when they began working for a competitor were trade secrets); *Liveware Publ'g, Inc. v. Best Software, Inc.*, 252 F. Supp. 2d 74, 84 (D. Del. 2003) (applying Delaware law) (holding that a list of customers using a software licensee's computerized payroll system, including licensed payroll reporting feature, was trade secret); *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1054 (Del. Super. Ct. 2001) (holding on summary judgment that there was a genuine issue of material fact as to whether a physician misappropriated trade secrets when he contacted his patients to let them know that he was relocating to another medical practice).

Here, Smash appears to have only disclosed a high-level plan to partner with waste management companies. On a high level, this plan seems like a relatively obvious one for an operator in the mobile trash compaction market space.

For the sake of argument, this high-level plan might be protectable information if it was something that, if kept secret, would give Smash an independent economic advantage over its competitors. *See, e.g.*, *AirFacts, Inc. v. de Amezaga,* 909 F.3d 84, 95-97 (4th Cir. 2018). Smash's plan to partner with local waste management companies arguably could provide Smash with an economic advantage over its competitors. Whether the plan conferred any economic advantage would depend on whether competitors also were looking to partner with local waste management companies and whether the plan would yield actual benefits to Smash.

Smash bears the burden on its application. Smash has not offered persuasive evidence of an independent economic advantage emanating from its plan's secrecy. As such, based on the record to date, Smash has not established a reasonable likelihood of success that it has a protectable trade secret in the form of its plan to partner with local waste management companies.

2. **Smash Did Not Take Reasonable Steps To Protect Its Trade Secrets.**

Assuming for the sake of analysis that Smash had protectable trade secrets, Smash did not take reasonable steps to protect their secrecy. Smash freely gave out the Zoom information for the Franchisee Forum Calls and the Founder Calls to anyone who had expressed interest in a franchise and completed the introductory call. Smash used the same Zoom meeting code for all of its meetings. Smash did not require that participants to enter

32

a password and did not use the waiting room feature to screen participants. Anyone who had expressed interest and received the code could join the calls, and participants could readily share the code with others.

Smash and Fastlane also did not follow their own procedures. Bode was supposed to take roll at the beginning of each call and remove anyone who did not belong, but she did not. The record establishes that twenty participants who cannot be identified listed to the meetings. There is no evidence that these individuals signed NDAs.

Because Smash did not take reasonable steps to protect its trade secrets, Smash has not established a reasonable likelihood of success on the merits of its claim for misappropriation of trade secrets.

**D.    Conversion**

In its fourth claim, Smash argues that the defendants converted Smash's confidential information for its own benefit. Smash has not shown a reasonable probability of success on the merits of its conversion claim because it fails as a matter of law.

Conversion is "any distinct act of dominion wrongfully exerted over the property of another, in denial of the plaintiff's right, or inconsistent with it." *Kuroda*, 971 A.2d at 889. Under DUTSA, Smash's conversion claim is preempted and cannot be asserted. *See Sanirab Corp. v. Sunroc Corp.*, 2002 WL 1288732, *4 (Del. Super. 2002) (dismissing conversion claim as a matter of law); *Ethypharm S.A. France v. Bentley Pharm., Inc.*, 388 F. Supp. 2d 426, 433 (D. Del. 2005) (holding that the DUTSA preempts "all claims stemming from the same acts as the alleged misappropriation"). It is also unlikely Smash

33

could maintain a conversion claim for the type of intangible information that Smash claims the defendants took. *See Restatement (Second) of Torts* § 242 (1965).

**E.     Unfair Competition**

In its fifth claim, Smash argues that Dumpster Devil engaged in unfair competition by using Confidential Information in violation of the NDA and misappropriating Smash's trade secrets. This claim depends on Smash establishing that Perri used Smash's confidential information and misappropriated Smash's trade secrets. Because Smash failed to establish a reasonable likelihood of success on the predicate acts necessary for an unfair competition claim, Smash has failed to establish a reasonable likelihood of success on this claim as well.

**F.     Fraud**

In its sixth claim, Smash argues that Perri and Kanda Holdings committed fraud. A claim for fraud requires the existence of (i) a false representation, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth, (iii) the defendant's intention to induce action based on the representation, (iv) the plaintiff's reasonable reliance on the representation, and (v) causally related damages. *See Stephenson v. Capano Dev.*, Inc., 462 A.2d 1069, 1074 (Del. 1983). Smash has demonstrated a reasonable probability of success on the merits of this claim.

It is reasonably likely that Perri made false representations about his intention to purchase a franchise. The record indicates that on December 12, 2019, Perri decided that he was no longer interested in purchasing a Smash franchise and would attempt to build a

competing mobile trash compaction company. Yet after making this decision, he continued to indicate to Smash that he was interested in a franchise. Among other things,

- He purchased (then secretly cancelled) a plane ticket and signed up for discovery day.

- He continued to participate in Franchisee Forum Calls and Founder Calls.

- He cancelled his attendance at one discovery day and signed up for another.

- He told Smash that he was interested in purchasing territories in North Carolina. Dkt. 84 Exs. 14, 15.

Perri knew that his representations were false. Instead of planning to purchase a franchise, he and McLaren prepared to launch a competing business.

It also is reasonably likely that Perri intended to induce Smash to rely on his misrepresentations. He wanted to continue learning about Smash's business, and to do that he needed to appear to be interested in Smash's business. Smash reasonably relied on Perri's representations. To Smash and Fastlane, Perri likely seemed like any other potential franchisee.

At this stage of the case, the weakest element of Smash's fraud claim is damages. Smash has not attempted to prove causally related damages because Smash is focused on obtaining injunctive relief. It will be difficult for Smash to prove a meaningful amount of damages because the principal consequence of the defendants' fraud was to enable the defendants to access information that does not appear to be confidential or protected. In addition, Perri was not the only participant on the Founder Calls or the Franchisee Forum Calls, so Smash would have invested resources in hosting those calls and providing the

35

information in any event. It is nevertheless reasonably inferable that Smash suffered some form of damages, if only nominal damages.

Facing a viable fraud claim, the defendants argues that Smash is attempting to "bootstrap" a fraud claim out of a breach of contract claim. That is not the case.

A plaintiff impermissibly bootstraps a contract claim into a fraud claim when the plaintiff alleges that the defendant committed fraud because it never intended to perform under the parties' agreement. *See Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010). A bootstrapped fraud claim thus takes the simple fact of nonperformance, adds a dollop of the counterparty's subjective intent not to perform, and claims fraud. Through this artifice, a plaintiff attempts to take a straightforward claim for breach of contract and convert it into a fraud claim by adding allegations about subjective intent. The anti-bootstrapping doctrine prevents a plaintiff from using this simple maneuver to convert a contract claim into a fraud claim.

Smash is not bootstrapping. Smash has asserted a freestanding claim for fraud based on representations Perri made to Fastlane about his interest in purchasing a franchise. A plaintiff can maintain a fraud claim alongside a claim for breach of contract when the fraud is based on misrepresentations other than an intent to perform under the agreement.[4] Smash

---

[4] *See Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050-51(Del. Ch. 2006); *Kainos Evolve, Inc. v. InTouch Techs., Inc.*, 2019 WL 7373796, at *3 (Del. Ch. Dec. 31, 2019); *ITW Glob. Invs. Inc. v. Am. Indus. P'rs Capital Fund IV, L.P.*, 2015 WL 3970908, at *7 (Del. Super. June 24, 2015); *Osram Sylvania Inc. v. Townsend Ventures*, LLC, 2013 WL 6199554, at *16 (Del. Ch. Nov. 19, 2013).

has properly asserted a fraud claim and established a reasonable likelihood of success on the merits.

## G.    Deceptive Trade Practices

In its seventh claim, Smash argues that Dumpster Devil made false representations on its website when it compared Smash's equipment to its equipment, violating the Delaware Deceptive Trade Practices Act (the "DTPA"). Under the DTPA, "[a] person engages in a deceptive trade practice" if he performs any one of the enumerated acts, including an act that "disparages the goods, services, or business of another by false or misleading representation of fact." 6 *Del. C.* § 2532(a)(8). To prevail, "a complainant need not prove competition between the parties or actual confusion or misunderstanding." 6 *Del. C.* § 2532(b).

Smash points to seven statements on Dumpster Devil's website that allegedly disparaged Smash's goods and services through false or misleading representations of fact. The first claim is that Dumpster Devil's drum weighs one-half of a ton more than Smash's drum. Smash has not established a reasonable likelihood of success on the merits of this claim. The evidence at this stage of the case indicates that Dumpster Devil's drum is heavier than Smash's drum, so that part of the statement appears accurate. *See* Dkt. 94 Ex. 34; McLaren Dep II. at 93. Smash had the evidentiary burden to show that the one-half ton description was incorrect but has not provided an evidentiary support that would call into question the comparison.

The second claim is that the greater weight of Dumpster Devil's drum leads to faster trash compaction. Smash has not established a reasonable likelihood of success on the

37

merits of this claim. As a matter of physics, a heavier drum can lead to faster compaction. Perri Dep. II. at 172. Haskin claimed that a heavier weight can also "cause breakage or damage to the unit and/or truck." Haskin Dep. 92–93. That is theoretically true, but it has nothing to do with rate of compaction. Smash has failed to meet its burden on this issue.

The third claim is that Smash's drum lack guards. The evidence shows that this assertion is incorrect: Smash's drum has guards. *See* Haskin Dep. at 92–93; Dkt. 94 Ex. 34. Smash has established a reasonable likelihood of success on the merits of this claim.

The fourth claim is that Husmann, Smash's supplier, has sold less than fifty truck-mounted compactors. Dumpster Devil's website states that Packmat has sold "400 units in Europe." Dkt. 84 Ex. 2. It then says that "Husmann has only sold 50." *Id.* These statements pertain to the European market and are accurate.

The fifth claim is that Smash's truck bed requires daily greasing, which reduces efficiency. Smash has established a reasonable likelihood of success on the merits of its claim about daily greasing. The sliding bed on Smash truck needs greasing, but not daily greasing. Haskin Dep. at 100. Whether the maintenance and greasing decreases efficiency is a matter of opinion. At the current stage of the case, Smash has established a reasonable likelihood of success on the merits of its claim about daily greasing, but not about the balance of this statement.

The sixth claim is that Dumpster Devil's equipment is 10% more efficient than Smash's equipment. Smash has not established a reasonable likelihood of success on the merits of this claim. Smash reasons that without seeing or operating one of its trucks, Perri has no way of knowing a Smash truck's efficiency. At this stage of the case, however,

Smash must provide evidence that the statement is false or misleading. Smash has not provided any evidence and has therefore failed to meet its burden.

The final claim is that Dumpster Devil's website asserts that both its trucks and Smash's trucks weigh just under 26,000 pounds and that neither requires a commercial license to operate. These statements are true for Smash's trucks. McLaren admitted that Dumpster Devil's truck weighs just over 26,000 pounds and requires a commercial license to operate. McLaren Dep. I at 106. Smash has demonstrated a reasonable likelihood of success on the merits of this statement.

## H.     Trademark Infringement

In its eighth claim, Smash asserts that Dumpster Devil infringed on Smash's trademark by purchasing the name "Smash My Trash" for purposes of a Google AdWords campaign. To succeed on a claim for trademark infringement, Smash must prove that (i) it owns the mark at issue; (ii) the mark is valid and legally protectable; and (iii) Dumpster Devil's use of the mark is likely to create actual confusion. *Checkpoint Sys., Inc. v. Check Point Software Tech., Inc.*, 269 F.3d 270, 279 (3d Cir. 2001). The first two elements are not in dispute.

Proving actual confusion is a "very fact intensive" undertaking. *See Microsoft Corp. v. Softicle.com*, 2017 WL 5517379, *5 (D.N.J. 2017). The burden is significantly heavier if the buyers have expertise in the field or the goods are relatively expensive.[5] A claim of

---

[5] *See Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1152 (9th Cir. 2011); *see also Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 284 (3d Cir. 2001) ("Where the relevant products are expensive, or the buyer

confusion based on paid website advertisements will not succeed if the search engine "partitioned their search results pages so that the advertisements appear in separately labeled sections for sponsored links" and "the labeling and appearance of the advertisements as they appear on the results page includes more than the text of the advertisement." *Network Automation, Inc.*, 638 F.3d at 1154.

Smash has grounded its claim of confusion on an AdWords campaign where Dumpster Devil's product appeared as a paid advertisement. Although Smash does not necessarily market to experts in the field, it sells an expensive product to individuals who are likely to conduct research before making a purchase. According to Smash's Disclosure Documents, it costs between $220,000 and $240,000 to start a Smash franchise. Smash and Dumpster Devil market their products to individuals who are interested in starting a business. A prospective purchase is likely to perform due diligence before making this type of investment.

Given these facts, the likelihood of actual confusion is quite low. Smash's only evidence consists of a picture of Google's current landing page for Dumpster Devil's advertisement. The advertisement states, "Compare Our Dumpster Smasher–No Franchise Fees, Higher ROI." Dkt. 84 Ex. 43. Google marks Dumpster Devil's listing with the bolded

---

class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations."); *New Balance Athletics, Inc. v. USA New Bunren Int'l Co. Ltd. LLC*, 424 F. Supp. 3d 334, 348 (D. Del. 2019) ("The reasonably prudent buyer is assumed to take more care in purchasing 'expensive' items which he buys infrequently, than in buying everyday, relatively inexpensive items.").

word "Ad" on the upper right-hand corner. The advertisement does not display Smash's mark.

Under established precedent, this quantum of evidence is not sufficient to support a claim of actual confusion. *See Toyota Motor Sales v. Tabari*, 610 F.3d, 1171, 1179 (9th Cir. 2010); E-Commerce and Internet Law § 9.11[1] (2019 update) (collecting cases). Smash has failed to establish a reasonable likelihood of success on its trademark infringement claim.

## I.      Irreparable Harm

The second requirement for a preliminary injunction is a showing of irreparable harm if the injunction is not granted. *Revlon*, 506 A.2d at 179. Harm is irreparable unless "[a]lternative legal redress [is] clearly available and [is] as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557 (Del. Ch. 2000) (alteration in original) (footnotes and internal quotation marks omitted). "Irreparable injury exists when [damages] would involve speculation," such as harmed "reputation, goodwill, customer relationships, and employee morale." *In re Shawe & Elting LLC*, 2015 WL 4874733, at *28 (Del. Ch. Aug. 13, 2015) (internal quotation marks omitted), *aff'd sub nom. Shawe v. Elting*, 157 A.3d 152 (Del. 2017). For that reason, "the danger of losing valuable revenue-generating relationships is a harm that may not be compensable in any manner other than injunctive relief." *ZRii, LLC v. Wellness Acq. Gp., Inc*., 2009 WL 2998169, at *13 (Del. Ch. Sept. 21, 2009).

The only claims where Smash has established a reasonable probability of success on the merits are for fraud and deceptive trade practices. The two claims lead to different conclusions regarding irreparable harm.

Because of the nature of the information that the defendants obtained, it is unlikely that Smash suffered meaningful harm, much less irreparable harm, as a result of the defendants' fraud. The fraud claim standing alone is not substantial enough to support injunctive relief.

The deceptive trade practice stands on a different footing. "[A] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable. Proof of monetary damage, loss of profits, or intent to deceive, is not required." 6 *Del. C.* § 2533(a). As the statute suggests, the deceptive statements on the Dumpster Devil website are presently inflicting harm on Smash on an ongoing basis. Those statements give rise to irreparable harm.

## J.    Balancing Of The Equities

The final element of the injunction standard is the balancing of hardships:

> [A] court must be cautious that its injunctive order does not threaten more harm than good. That is, a court in exercising its discretion to issue or deny such a preliminary remedy must consider all of the foreseeable consequences of its order and balance them. It cannot, in equity, risk greater harm to defendants, the public or other identified interests, in granting the injunction, than it seeks to prevent.

42

*Lennane v. ASK Comput. Sys., Inc.*, 1990 WL 154150, at *6 (Del. Ch. Oct. 11, 1990) (Allen, C.). The equities favor an injunction that addresses Dumpster Devil's deceptive marketing tactics. They do not support a broader injunction.

Smash has made the requisite showing for an injunction barring Dumpster Devil from continuing to publish the false and misleading statements on its website. Those false statements are inflicting irreparable harm on Smash. Enjoining Dumpster Devil from continuing to make these statements pending a final hearing on the merits will not inflict substantial harm on Dumpster Devil. It will merely prevent Dumpster Devil from making three assertions. A targeted injunction can address those statements.

The equities do not favor an injunction based on Smash's claim of fraud. As an interim remedy, Smash seeks an injunction that would prevent Dumpster Devil from operating its business. An injunction of that magnitude would be the equivalent of final relief.

Although perhaps warranted in an egregious case involving the theft of truly confidential information, Smash has not made the requisite showing. There is no question that Perri's behavior was duplicitous and egregious. Perri gained access to Smash's Franchise Forum Calls and Founder Calls under false pretenses, but the information that Smash shared on those calls was little different from the information that it shared in its Disclosure Document, its pitch deck, and on its introductory calls. The defendants also established that the information shared during Franchisee Forum Calls was not protected. In a physical-world counterpart to Perri's virtual-world escapades, Perri talked his way past a receptionist and into Smash's offices, but he took a stack of presentations containing

43

information that Smash was already disclosing from a part of the building that was accessible through an open door. A business-stopping injunction would be disproportionate on the facts of the case.

## III.    CONCLUSION

Pending a decision on the merits after trial, Dumpster Devil is enjoined from making statements about (i) Smash's drum lacking guards, (ii) the Smash truck's slides needing daily greasing, and (iii) the Dumpster Devil truck weighing less than 26,000 pounds and not requiring a commercial license. Otherwise, Smash's application for a preliminary injunction is denied.